§IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENNIFER SALVATORE, | : |
| Plaintiff, | : |
| v. | : 3:13-CV-02975 |
| | : (JUDGE MARIANI) |
| BLUE CROSS OF NORTHEASTERN PENNSYLVANIA, | : |
| Defendant. | : |

## MEMORANDUM OPINION

### I.   Introduction

Presently before the Court is a Motion to Dismiss Plaintiff's Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court will deny the Motion.

### II.   Factual Allegations and Procedural History

The instant Motion to Dismiss is the second such Motion that Defendant Blue Cross of Northeastern Pennsylvania filed in this case. Plaintiff's last Complaint ("the First Amended Complaint") alleged four counts against Blue Cross and Plaintiff's former employer, Andrew Brown's Drug Store, the latter of whom was dismissed from the case by mutual agreement. (*See* Order, Sep. 9, 2014, Doc. 21, at 1-2.) Blue Cross moved to dismiss all remaining counts in the First Amended Complaint. Its Motion resulted in a substantial Opinion by this Court. (*See generally* Mem. Op., Sep. 15, 2015, Doc. 22.) In that Opinion, we summarized the then-existing factual allegations as follows:

"On or about May 16, 2008, Plaintiff [Jennifer Salvatore] entered into a verbal agreement for employment with Andrew Brown's with an agreed start date of June 16, 2008." (Am. Compl., Doc. 7, at ¶ 5.) As part of Salvatore's compensation, Andrew Brown's would provide her "with full medical, dental and vision insurance coverage for [her] and her family," though later the policy changed such that "Andrew Brown's would no longer be paying [its employees'] health insurance premiums in full and that all employees would henceforth be contributing to their health insurance premiums by way of a withdrawal from their paycheck." (Id. at ¶¶ 6, 11.) Initially, Salvatore's insurance policy was provided by nonparty Geisinger Health Plan. (Id. at ¶ 7.) The policy later switched to Defendant Blue Cross of Northeastern Pennsylvania, effective September 1, 2010. (Id. at ¶ 12.)

Apparently as part of the change from Geisinger to Blue Cross,
> [o]n or about August 15, 2010, . . . Andrew Brown's['] Office Manager presented Plaintiff with Defendant Blue Cross's medical underwriting questionnaire, explaining to Plaintiff that as a formality she would need to fill out specific sections of the questionnaire, namely, the personal information section which included name, address, date of birth, [and] social security number.

(Id. at ¶ 13.) "On or about August 16, 2010, upon completing the highlighted sections of the questionnaire, Plaintiff returned the questionnaire to . . . Andrew Brown's." (Id. at ¶ 14.) "Plaintiff signed and dated the medical questionnaire" and thereby "became an insured of Defendant, Blue Cross," as scheduled, "[o]n or about September 1, 2010." (Id. at ¶¶ 16-17.) Plaintiff only held a policy with Blue Cross for one year; on September 1, 2011, Andrew Brown's changed its employee group health care coverage back to Geisinger. (Id. at ¶ 21.)

During the time that she was covered by the Blue Cross plan, Salvatore "underwent a cervical fusion surgery at Geisinger Health System in Danville, Pennsylvania," on November 8, 2010. (Id. at ¶ 18.) "Prior to scheduling the surgery, in early October 2010, Plaintiff contacted Defendant Blue Cross to confirm that the cervical fusion surgery would be covered under her group health care policy." (Id. at ¶ 19.) "Defendant Blue Cross confirmed that the surgery would be covered under her group health care policy but that there would be higher deductible fees because Geisinger Health System was an 'out of network' provider." (Id. at ¶ 20.)

Approximately one year after her surgery, on November 21, 2011, Blue Cross informed Salvatore by letter that her insurance policy would be rescinded from its inception date of September 1, 2010. (Id. at ¶ 25.) This

> meant that Salvatore would become responsible for all payments for all of the health care services that she obtained in the year that she was purportedly covered by Blue Cross, including her surgery, which totaled over $50,000. (*Id.* at ¶¶ 26, 30.) The letter stated that certain "'concerns' in Plaintiff's application process had prompted a review of her medical records" at which time "a 'misrepresentation' made in the application process had been discovered" that justified rescission. (*Id.* at ¶¶ 27-28.)
>
> Though Plaintiff's Amended Complaint does not directly indicate what the purported "misrepresentation" was, she pleads elsewhere that "[o]n or about May 31, 2008 [i.e., before accepting employment with Andrew Brown's], Plaintiff was a party to a car accident wherein [she] sustained injuries to her neck." (*Id.* at ¶ 8.) Blue Cross submitted further exhibits explaining these alleged misrepresentations as attachments to its Motion to Dismiss. The first is the letter notifying Salvatore of rescission, signed by one Trish Savitsky, Blue Cross's Vice President of Corporate Assurance and Compliance, and dated November 21, 2011. (*See* Mot. to Dismiss, Doc. 10, Ex. 2, at 1-2.) This letter informed Salvatore that "[s]ome concerns were identified with the application process regarding [your] policy which prompted a review, including a review of your medical records" and that "[u]pon review, it was determined that on the medical underwriting questionnaire, the information you provided was not accurate." (*Id.* at 1.) The inaccuracies cited were Salvatore's failure to inform Blue Cross that she "had a motor vehicle accident in May 2008 that caused disc problems" or that she "had an MRI on January 4, 2010." (*Id.*) Salvatore allegedly failed to disclose this information despite being directed to do so in the questionnaire. (*Id.*) As evidence of these misrepresentations, Blue Cross also submits to the record an excerpt of Salvatore's insurance application, in which a series of fields prompting the applicant to fill in medical history are left blank. (*See* Doc. 10., Ex. 3, at 1.) According to Savitsky's letter, if this information had "been disclosed, this medically underwritten policy's rates would have increased." (Doc. 10, Ex. 2, at 1.)

(Doc. 22 at 2-6 (internal footnotes omitted).)

The Plaintiff agreed to withdraw the claims in her First Amended Complaint for Breach of Contract and Bad Faith against Blue Cross. (*Id.* at 8-9.) The Court then proceeded to dismiss the only remaining count, styled "ERISA Violations." (*See id.* at 14.)

3

Plaintiff based this count on the argument that Blue Cross violated its fiduciary duties to her as a policyholder by rescinding her policy instead of pursuing alternative remedies, such as retroactively increasing her policy rates. (*See id.* at 9-10.) The Court rejected this argument on the grounds that the First Amended Complaint did not show that alternative remedies were even available under Plaintiff's benefit plan, (*see id.* at 11), and that, conclusory allegations to the contrary notwithstanding, the First Amended Complaint did not adequately plead that Blue Cross was actually put on notice of the omissions in Plaintiff's application before the time of surgery, which, if true, could cause the factfinder to conclude that Blue Cross should have amended the policy before Plaintiff's surgery, (*see id.* at 13-14). The Court nonetheless gave Plaintiff leave to amend her Complaint, concluding:

> A second amended complaint should set forth the specific policy provisions that justify a remedy short of rescission, any statements that Plaintiff made that reasonably put Blue Cross on notice of her medical conditions before the time that Blue Cross claims to have discovered them in Savitsky's rescission letter, and/or any other well-pleaded factual allegations that demonstrate that rescission was inappropriate, consistent with this Opinion.

(*Id.* at 14.)

Plaintiff filed a Second Amend Complaint, which realleges the "ERISA Violations" count against Defendant Blue Cross, but includes no others. (*See generally* Second Am. Compl., Doc. 26.) In so doing, she added certain factual allegations to those discussed above. First, the Second Amended Complaint provides new allegations intended to show that Blue Cross was aware of Plaintiff's preexisting conditions before she even underwent surgery. Plaintiff alleges that Blue Cross "was aware of Plaintiff's medical problems

4

immediately after her being insured," because its "records reveal, '[t]he member in question (Plaintiff) proceeded to have a pain management appointment on 9/10/10, a few days after her coverage became effective on 9/1/10.'" (*Id.* at ¶ 18 (quoting Blue Cross Special Investigation Unit Case Report, Second Am. Compl. Ex. A, at 1).) "Additionally, Blue Cross's records reveal that on October 26, 2010, the Defendant's representative, 'Jillian,' call[ed] Geisinger Hospital, the 'Provider' to discuss [a] 'C-section' Plaintiff was . . . 'having done.'" (*Id.* at ¶ 25 (quoting Recorded Telephone Conversation, Oct. 26, 2010, Second Am. Compl. Ex. C, at 1).) Though Plaintiff was not pregnant at the time—and the information about her "C-section" was therefore erroneous—Plaintiff argues that this conversation made Defendant "aware of an impending hospitalization and/or operation, for some type of operative procedure." (*Id.* at ¶ 26.) Finally, as alluded to above, Plaintiff alleges that "prior to the surgery on October 28, 2010, Plaintiff contacted Defendant Blue Cross to confirm that the orthopedic fusion surgery would be covered under her group health care policy" and Defendant confirmed that it would, albeit with higher deductible fees for an "out-of-network" provider. (*Id.* at ¶¶ 27-28.) Plaintiff submitted a transcript of this conversation as Exhibit D to her Second Amended Complaint.

That Complaint also adds various new allegations to show that rescission was permissible under the policy. It alleges that Plaintiff "only filled out those sections of the application that she was instructed to her by her employer, Andrew Brown's Drug Store, leaving some portions of the application blank." (*Id.* at ¶ 20.) But according to Plaintiff,

5

"Defendant's policies . . . reveal that when a new policy is being considered, if the policyholder's application is incomplete, Blue Cross requires its underwriting department to, '. . . contact the submitter to get a complete questionnaire'" and to "take a number of steps to obtain the information requested." (*Id.* at ¶¶ 22-23 (quoting Small Group New to Blue Rate Quote Process, Second Am. Compl. Ex. B, at ¶ 5(a)(i)(3), (a)(ii)).) "Further, Defendant's policy require[s] when the information is incomplete, or if questions are incomplete, '. . . underwriting will rate using the worst case scenario.'" (*Id.* at ¶ 24 (quoting Ex. B at ¶ 5(a)(i)(3)).)

Plaintiff also relies on procedures entitled "Small Group Medical Underwriting: New Member Enrollment Process" to show the availability of other remedies. (*See id.* at ¶ 37.) In the section entitled "Medical Underwriting," these procedures instruct employees to:

> Review with the Underwriting Director to determine if Underwriting feels the rate change should be passed onto the group. Underwriting will use their judgment as to whether to recommend passing on the increase to the group and the effective date of the change. The effective date should be a minimum of 30 days from the date the notification is delivered to the Regional Sales Director. The effective date is always the first of the month. Is the decision to recommend passing the increase to the group?
>     i. No, process ends.
>     ii. Yes. Put the factors into Xlogic, and upload it. Xlogic will calculate the new rates. Underwriting Director communicates with VP Account Advocacy and Regional Sales Director.

(*Id.* at ¶ 38 (quoting Small Group Medical Underwriting, Second Am. Compl. Ex. F, at ¶ 5(a)(3)(c).) Plaintiff then interprets other portions of this document "to reveal that if the rates are increased retroactively, policyholder may either cancel the policy or changes in benefits

may be negotiated," (*id.* at ¶ 39 (quoting Ex. F at ¶ 10),[1] and that "such a retroactive rate increase results in an open enrollment for all insureds, which would allow for the employer and employees to select coverage accordingly," (*id.* at ¶ 40 (quoting Ex. F at ¶¶ 11-12)).[2]

---

[1] The cited paragraph reads as follows:

Group Administrator Buying Decision:
   a. Group wants additional benefit options: Sales Representative goes into eCustomer and creates benefits option quotes and group declaration pages. The renewal date for the group will not be changed unless the group is going to add a benefit that did not exist 12 months prior to the renewal date, than [sic] a full renewal for the group must be done.
   b. Group declines rate quote and requests to cancel with BCNEPA. Sales Representative must have a cancellation request submitted through SOAR.

(Ex. F at ¶ 10.)

[2] The cited paragraphs read as follows:

11. Sales Representatives
   a. Group Buys a quote from BCNEPA:
      i. Holds open enrollment meetings and distributes the enrollment applications, which can be prefilled from the available data in CMBS.
      ii. Did the group purchase the current benefits and new rates?
         1. Yes, no profile required.
         2. No, the group purchased new benefits and rates, Sales Representatives has the ASR submit the profile(s) through the profile process.
      iii. Submits the completed applications using the Follow Up Profile Attachment Form. Enrollment & Billing will enroll the members, or the groups can use the EEP.
12. Frequently Asked Questions:
   a. Is this change in rates a Section 125 qualifying event? Yes, therefore each member will have the option of changing coverage.
   b. Is it a compliance issue to re-rate the group because the group administrator will know the increase was due to the new hire(s)? No, the group administrator is not aware of the specific medical conditions on the rates increased due to something.
   c. How long are the quoted rates valid? 60 days.
   d. How long are the Medical Questionnaires good for? 60 days.
   e. Will changes in the group census require a review? Any changes from what was initially underwritten will need to be reviewed.
   f. If a group receives an increase with this process, can a rate concession be requested? No, if a group deserves the change a concession will not be approved.
   g. Due to the process if a profile is after the "cut off" date will it be approved by the Profile Challenge Committee? The challenge form will need to be submitted to the committee for a decision

(Ex. F at ¶¶ 11-12.)

Defendant then filed a Second Motion to Dismiss, arguing that the Second Amended Complaint still fails to correct the deficiencies cited in the Court's Opinion.

Because none of the new allegations related to the actual insurance policy, despite the fact that the Second Amended Complaint and Motion to Dismiss explicitly relied on that policy, the Court ordered the parties to submit what they agree is a true and accurate copy of the policy before we considered the Motion to Dismiss. (*See* Order, Oct. 22, 2015, Doc. 33, at ¶ 1.) The parties complied and submitted the policy. (*See* Policy, Doc. 36.)

### III. Standard of Review

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-1965 (internal citations and alterations omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555, 127 S. Ct. at 1965. A court

"take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

However, even if a "complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that

amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

### IV. Analysis

The Third Circuit has not addressed whether an insurer is entitled to rescind an ERISA policy based on material misrepresentations in a policy application. *See McBride v. Hartford Life & Accident Ins. Co.*, Civ. No. 05-6172, 2007 WL 5185293, at *17 (E.D. Pa. Jan. 29, 2007). However, legislative history shows that Congress intended the district courts to create a body of federal common law in which to apply ERISA. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 55-56, 107 S. Ct. 1549, 1557-58, 95 L. Ed. 2d 39 (1987); *Luby v. Teamsters Health, Welfare, & Pension Trust Funds*, 944 F.2d 1176, 1186 (3d Cir. 1991). "[B]ecause 'ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans,' federal courts must a fashion a federal common law to regulate such lawsuits." *Hauser v. Life Gen. Sec. Ins. Co.*, 56 F.3d 1330, 1333 (11th Cir. 1995) (quoting *Reid v. Prudential Ins. Co.*, 755 F. Supp. 372, 375 (M.D. Fla. 1990)).

District and circuit courts around the country have applied ERISA's common law to conclude that material misrepresentations made in an application for a benefits policy may lead to rescission. *See McBride*, 2007 WL 5185293, at *17-18 & n.32 (collecting cases); *Shipley v. Arkansas Blue Cross & Blue Shield*, 333 F.3d 898, 902 (8th Cir. 2003) ("After considering the policy implications in this case, we, like a number of our sister circuits, conclude that federal common law allows for the equitable rescission of an ERISA-governed

insurance policy that is procured through the material misstatements or omissions of the insured.") (collecting cases). As these courts noted, rescission for material misstatements "is consistent with general contract and insurance law principles." *Shipley*, 333 F.3d at 902-03 (collecting cases); *cf. also United Mine Workers of Am. v. Panther Branch Coal Co.*, Civ. No. 06-892, 2008 WL 149142, at *6 (S.D. W.V. Jan. 11, 2008) ("The rule allowing a defendant to use as a defense a purported beneficiary's misrepresentations accords with 'the settled principle of contract law that wherever the circumstances are such as to warrant an action for deceit for inducing a person to enter into a contract, they will certainly warrant avoidance or rescission of the bargain.'") (quoting *Nash v. Trs. of Boston Univ.*, 946 F.2d 960, 965-66 (1st Cir. 1991)).

The case on which Plaintiff relies, *Werdehausen v. Benicorp Insurance Co.*, 487 F.3d 660 (8th Cir. 2007), clarifies that the Eighth Circuit's holding in *Shipley* "permits but does not require retroactive rescission for innocent material non-disclosures." *Werdehausen*, 487 F.3d at 665. It therefore held that "[w]hen the benefit plan makes alternative remedies available, the benefits decision-maker must act in accordance with its duties as an ERISA fiduciary in choosing among these remedies." *Id.*

Thus, we first look to the actual terms of Plaintiff's benefit plan. In the section entitled "Termination," her policy provides that "[t]his Policy will be terminated, at First Priority Life's [the insurer's] option" if, among other things, "the Policy Holder performs an act or practice that constitutes fraud or makes an intentional misrepresentation of material fact under the

11

terms of coverage." (Doc. 36 at 61.) It adds: "If this Policy is terminated because of fraud, the liability of First Priority Life will cease as of the date of such termination, and no benefits will be provided for Covered Medical Expenses incurred after that date." (*Id.*) Likewise,

> [i]f it is proven that the Insured attempted or committed fraud under this Policy to obtain benefits or payment or if the Insured makes an intentional misrepresentation of material fact in the Application for coverage under this Policy, the Insured's coverage under this Policy will be terminated. If benefits were provided under such circumstances, First Priority Life may pursue legal action in order to obtain reimbursement from the Insured.

(*Id.* at 62.)

Given this background, the Court will deny Defendant's Motion to Dismiss, for the following reasons.

First, it is not clear from the face of the Second Amended Complaint and supporting materials that Plaintiff either attempted or committed fraud in her application for benefits or that she made an intentional misrepresentation of material fact. While we are privy to Trish Savitsky's explanations of Blue Cross's own belief about where the misrepresentations existed, (*see supra* p. 3), it is the Second Amended Complaint itself that is controlling at this stage. But that Complaint merely alleges that Plaintiff was in a car accident in 2008 and sustained injuries to her neck. (*See* Second Am. Compl. at ¶ 8.) These are well-pleaded allegations that the Court must accept as true when resolving a motion to dismiss. Conversely, while Savitsky's statements may be accepted an accurate representation of Blue Cross's reasons for rescinding the policy, we cannot accept their content as true at this

stage in a way that would ignore the well-pleaded allegations of Plaintiff's Complaint.[3] When we consider the case from this perspective, it becomes at the very least a matter of interpretation as to whether Plaintiff made any misstatements on her application for benefits, as none of the boxes in which she was required to check preexisting conditions directly address the conditions alleged in her Second Amended Complaint. Thus, the extent of Plaintiff's preexisting conditions and whether she adequately disclosed them are issues that cannot be resolved on the pleadings alone, but rather require additional discovery.

Second, even if it could be established that Plaintiff committed fraud or made intentional misrepresentations of material fact, the Policy does not explicitly authorize rescission. It only allows the insurer to terminate the policy prospectively and to initiate legal actions to recover money that was obtained through fraud or intentional misrepresentation. (*See supra* pp. 11-12.) Blue Cross, however, followed a different path by unilaterally declaring the Policy void *ab initio* and shifting the burden of paying the providers to the Plaintiff. (Second Am. Compl. at ¶ 34.) Thus, though Defendant objects that the Policy does not support Plaintiff's desire for a retroactive rate increase, the Policy also does not support the retroactive rescission that Defendant actually employed. It is true that the case law discussed above allows rescission as an equitable remedy that may be imposed even in the absence of explicit authorization. But the equitable remedies to which *either party* may be

---

[3] Moreover, even if the Second Amended Complaint and the Savitsky letter agreed on the substance of Plaintiff's preexisting conditions, it would still be unclear whether Plaintiff's failure to disclose those was "material" (as opposed to *de minimis*) or "intentional" (as opposed to innocent) or whether it rises to the level of fraud. These questions of mental state and intent are questions of fact most appropriately determined much later in the proceedings and not at the pleading stage.

entitled inherently rely on issues of fact that cannot be determined at the pleading stage. In order to impose equitable remedies not authorized by the Policy, the Court would need much deeper factual knowledge of each party's relative position through a fully developed record, which, again, necessitates discovery, and thereafter, possibly, trial.

Because Defendant has not shown that the Second Amended Complaint fails to state an ERISA claim on the basis of the language of Plaintiff's Policy, it is not necessary to address the other issues raised in Plaintiff's brief. That is, the Court takes no position on whether Plaintiff's Medical Underwriting Questionnaire was incomplete and should have prompted further review or follow-up before her surgery took place; whether the internal operating procedures that Plaintiff cites have any binding effect or applicability to this case; or whether the conversations between Plaintiff and her agent and Blue Cross representatives actually put Blue Cross on notice of inaccuracies in her insurance application or should reasonably have put Blue Cross on such notice, *before* the surgery occurred.[4] Nor does the Court take a position on the merits of any defenses that Blue Cross holds or on either party's ability to argue its entitlement to equitable relief. All of these

---

[4] The Third Circuit has long held that the principle of estoppel applies to benefit denial disputes under ERISA. *See Rosen v. Hotel and Restaurant Employees & Bartenders Union of Phila.*, 637 F.2d 592, 597 (3d Cir. 1981). "The principle of estoppel is the 'representation of fact made to a party who relies thereon with the right to so rely, (that) may not be denied by the party making the representation if such denial would result in injury or damage to the relying party.'" *Id.* More specifically, the Court in *Jenkins v. Union Labor Life Company*, 543 Fed. App'x. 180 (3d Cir. 2013) noted that the "extraordinary circumstances" necessary for the application of equitable estoppel under ERISA were present in its prior decision in *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 238 (3d Cir. 1994) "when an insurer informed a patient that certain coverage would be provided and then denied coverage." 543 Fed. App'x. at 185.

Amended Complaint and the documents properly considered along with it, we find that Plaintiff adequately states an ERISA claim.

## V. Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 28) is **DENIED**. A separate Order follows.

/s/ Robert D. Mariani
Robert D. Mariani
United States District Judge